# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

GARY JOSEPH

                                   CIVIL ACTION NO.

VERSUS

                                   19-17-JWD-RLB

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY

## RULING AND ORDER

This matter is before the Court on a *Motion for Judgment on the Administrative Record* ("*Hartford Motion*") filed by Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford") (Doc. 15) and a cross motion ("*Plaintiff Motion*") filed by Plaintiff, Gary Joseph, ("Plaintiff" or "Joseph") (Doc. 18). The cross motions are fully briefed, and the administrative record has been filed. (Docs. 23, 24, 25, 28.) Oral argument is not necessary. Having considered the facts, the arguments of the parties and for the reasons expressed below, the Court remands the case to Hartford for further proceedings not inconsistent with this opinion.

## FACTUAL BACKGROUND

Prior to a motor vehicle accident on April 15, 2013, Plaintiff worked at Reyes Holdings, LLC as a warehouse operator and then an eighteen-wheeler driver. (Doc. 10-3 at H0065; Doc. 10-9 at H1406, 1446.) As an eighteen-wheeler driver, Plaintiff was salaried at $67,104 annually. (Doc. 10-9 at H1407.) Plaintiff was a participant in a group long term disability plan through his employer Reyes Holdings, LLC. The disability plan was funded by an insurance policy issued by Hartford ("Disability Policy") and claims were administered by Hartford. (Doc. 10-2.)

a. *The Disability Policy*

The Disability Policy is governed by Employee Retirement Income Security Act of 1974 ("ERISA"). (Doc. 12.) The Disability Policy details the requirements, policies, and procedures

for making claim as well as Hartford's process for administering claims. (Doc. 10-2 at H0001-H0051; H0034-H0039.) It also details the policyholder's ERISA rights and the required disclosures. (*Id.*)

The Disability Policy grants Hartford with full discretion and authority to construe and interpret all terms and provisions of the Disability Policy and determine eligibility for benefits. (Doc. 12.) The Disability Policy defines Disability or Disabled to mean:

> You are prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period;  2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation.

(Doc. 10-2 at H0021-22.) It further provides that

> **Essential Duty** means a duty that: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty.

(Doc. 10-2 at H0022.)

The Disability Policy sets out a 180-day Elimination Period, during which benefits are not payable. (Doc. 10-2 at H0009 and H0022.) It also sets out an "Own Occupation" standard of disability which can occur when, during the Elimination Period or for 24 months after the Elimination period, a participant suffers from an injury, sickness, illness or other qualifying event that prevents the individual from performing one or more of the essential duties of his or her own occupation. (Doc. 10-2 at Bates Nos. H0022-H0025.) Under the Own Occupation standard, the participant will be eligible to receive disability benefits for 24 months. (*Id.*) In contrast, the "Any Occupation" standard of disability provides that if a participant continues to be prevented from performing any one or more of the essential duties of any occupation due to injury, sickness, illness or other qualifying conditions, the participant may continue to receive

long-term disability benefits up to a maximum period of time designated in the Disability Policy.

(*Id.* at H0021-H0022.)

The Disability Policy sets out:

**Legal Actions:** *When can legal action be taken against Us?* Legal action cannot be taken against [Hartford]: 1) sooner than 60 days after the date Proof of Loss is given; or 2) more than 3 years after the date Proof of Loss is required to be given according to the terms of The Policy.

(Doc. 10-2 at H0020.) Under the Disability Policy, Proof of Loss

must be sent to [Hartford] within 90 days after the start of the period for which [Hartford] [is] liable for payment. If proof is not given by the time it is due, it will not affect the claim if: 1) it was not possible to give proof within the required time; and 2) proof is given as soon as possible; but 3) not later than 1 year after it is due, unless [participant] [is] not legally competent. [Hartford] may request Proof of Loss throughout [the] Disability. In such cases, [Hartford] must receive the proof within 30 day(s) of the request.

(*Id.* at H0018.)

b. *Plaintiff's claim*

In June 2017, Plaintiff submitted a claim for long-term disability benefits under the Disability Policy. Plaintiff claimed his disability of back, neck and hip pain as the result of a motor vehicle accident arose on April 15, 2013, on his last day of work as a commercial driver at Reyes Holdings, LLC. (Doc. 10-4.)

Exercising its discretion, Hartford approved Plaintiff's disability benefits under the "Own Occupation" standard of disability. The Own Occupation benefits had an effective date of November 1, 2013 and were approved for the full 24 months, ending November 1, 2015. (Doc. 10-3 at H0061-H0068.)   Hartford found that Plaintiff was disabled under the Any Occupation standard from November 1, 2015 to November 19, 2016 because of Plaintiffs "symptoms and impairments resulting from Plaintiff's left hip osteoarthritis, lumbar stenosis, degenerative spondylolisthesis, cervical stenosis, and carpal tunnel syndrome." (Doc. 10-3 at H0064.)

However, Hartford denied benefits under the "Any Occupation" standard beyond November 19, 2016. (Doc. 10-3 at H0061-H0068.)

Hartford based its decision to deny benefits based on the information Plaintiff submitted including information from his treating physicians, Dr. Chambliss Harrod (Board Certified Orthopedic Surgeon) and Dr. Barrett Johnston (Board Certified Pain Management Physician).

   *c.   Treating Physician's medical records and conclusions*

   1.   Dr. Harrod

Dr. Harrod treated Plaintiff following his 2015 lumbar fusion (Doc. 10-4 at H0362.) Plaintiff complained of back and neck pain when he saw Dr. Harrod on June 19, 2015, August 3, 2015, September 14, 2015, November 13, 2015, January 5, 2016, and January 11, 2016. (*Id.* at H0354-362.) In January 2016, Dr. Harrod noted:

> Gary returns, still continuing to have pain in his neck, radiating down his right arm. He rates it as an 8-10, 4 at its best. He has tried therapy, anti-inflammatories, and wants to know about other treatment options. Had his MRI of the cervical spine done on 1/7/16 which revealed a multifactorial central stenosis moderate C6-C7 with developmentally small canal consistent with congenital stenosis with no signal change in the cord with mild stenosis C5-C6 due to disc bulging right sided foraminal uncinate hypertrophy. Mild foraminal stenosis noted at C6-C7. There is mild bilateral foraminal stenosis with moderate central stenosis due as well as congenital stenosis with modic endplate changes present.

(Doc. 10-4 at H0354.) Dr. Harrod again saw Plaintiff on April 13, 2016 at which time he discussed performing a cervical fusion. (*Id.* at H0352.) On December 7, 2016, Dr. Harrod detailed in his records that:

> Mr. Gary returns. We last saw him on 04/13/2016. He had gotten a second medical opinion from Dr. David Ferachi on 10/31/2016. At this point Dr. Ferachi thought that his treatment has been reasonable up to date. He was seen for his cervical lumbar spine. He did not recommend any cervical spine surgery. He also thought that he would get an EMG and nerve study done to rule out carpal tunnel syndrome, but they do recommend anti-inflammatories and the home exercise program. He would also recommend a Functional Capacity Evaluation to determine further work restrictions. That he could return to work at light duty, lifting no greater than 25 pounds. At this point, today he does continue to have pain in his right arm going

4

down into his elbow, equal to neck pain that he describes as worse with rotation. He also has back pain. Worse with standing and walking for about two blocks. Pain going down his left posterolateral aspect of his leg to the knee.

. . . Dr. Ferachi said that he did not recommend any cervical surgery. However, at this point, Mr. Joseph has failed all conservative measures including, therapy, anti-inflammatories, and pain medicine. Dr. Ferachi did find him to have normal Waddell's test. I found him to be reasonably appropriate. . . . I respect Dr. Ferachi's opinion, however, at this time in a gentleman that does have moderate cervical stenosis at C6-C7 with radiating pain into the arms I do believe that an EMG and nerve study is helpful to try to identify any comprehensive neuropathies in the arms. Certainly also, to see if there is any electrophysiological evidence of cervical radiculopathy. Also the absence of previous MRIs, I do agree that it is reasonable to, at that point consider cervical intervention with what I had stated before, the C5 to C7 ACDF. I decline on getting him a functional capacity evaluation at this time, as I do not think he is fully better, all of the way. He is having some recurrent neurogenic type claudication symptoms in his legs. He very well may need an MRI of his low back to make sure that he did not develop another adjacent segment problem.

(Doc. 10-4 at H0350-351.)

On January 16, 2017, Dr. Harrod notes that:

If there is no significant stenosis in the low back, I think he would be at maximum medical improvement as far as his low back goes that he probably could return to light duty with no lifting greater than 25 pounds. These may be permanent restrictions, but I do not think that I would recommend a functional capacity evaluation that may permanently limit him from being able to get back to work until at least his neck is fixed because as a truck driver, he cannot turn his head to the right and there is certainly no way that he can go back to work doing what he did before if he cannot turn his head.

(*Id.* at H0348.)

On February 27, 2017, Dr. Harrod confirmed Plaintiff could return to light duty work lifting no more than 25 pounds, with the following restrictions in a given workday: Plaintiff could walk/stand for 3 hours per day, sit for 4 hours per day, lift/carry less than 20 pounds per day frequently or occasionally, stoop very little, or less than 5% of the day, and work in a light or sedentary capacity full time. (Doc. 10-6 at H1028-1030.) Dr. Harrod clarified on April 17, 2017 that Plaintiff should not drive due to neck issues. (*Id.* at H1025.) Dr. Harrod added further

restrictions to Plaintiff's abilities on July 31, 2017 recommending permanent disability. (*Id.* at H1021.)

2. Dr. Johnston

On February 5, 2016, Plaintiff visited Dr. Barrett Johnston for his neck pain. Plaintiff reported pain at a 7/10, with 10 being the most severe. (Doc. 10-5 at H0486.) Dr. Johnston prescribed Norco and planned epidural steroid injections to treat the pain. (*Id.*) In January 2017 and April 2017, Dr. Johnston reported Plaintiff having pain and needing medications. (*Id.* at H0485-498.) On July 12, 2017, Dr. Johnston notes that Plaintiff is still complaining about neck pain, but also hip pain rated 8/10 with difficult walking and provides similar treatment. (*Id.* at H0498.)

d. *Dr. Christopher Zarro's Independent Medical Peer Review.*

Hartford had an Independent Medical Peer Review of Plaintiff's claim done by Dr. Christopher Zarro, which included the review of Plaintiff's medical history, medical records, and course of treatment. (Doc. 10-7 at H1117-H1120.) In the course of Dr. Zarro's evaluation, Dr. Zarro was not able to speak directly to Plaintiff's treating physicians, although he spoke briefly with a physician's assistant in Dr. Harrod's office and an employee from Dr. Johnston's office. (*Id.* at H1117.) Dr. Zarro also did not speak with or examine Plaintiff. Dr. Zarro summarized Plaintiff's medical records stating:

> [Plaintiff], DOB 11/2/66, was involved in a MVC (motor vehicle collision) on 4/15/13. The mechanism of injury was described as a side impact collision. [Plaintiff] was subsequently evaluated for neck, back and hip pain. Treatment included a hip arthroplasty, lumbar L4-5 fusion, epidural injections and therapy. A recent physical exam documented decreased range of motion of the cervical and lumbar spine, 4-5 right biceps strength, decreased sensation to the thumb and radial aspect of the forearm. The MRI of the neck revealed degenerative changes. The NCS/EMG (nerve conduction studies/electromyogram) studies revealed carpal tunnel syndrome but no cervical radiculopathy.

Past history includes back pain treated in 2009, left carpal tunnel release and knee arthroscopy.

Dr. Harrod saw the claimant form 11/19/14 to 7/26/17. He was evaluated and treated for neck and back pain. The physical exam documented decreased range of motion, tenderness to palpation, diminished sensation in the right upper extremity, decreased right biceps strength graded 4/5. Treatment has included a lumbar fusion of the L4/5 on 5/19/15, epidural injections and therapy. The spinal fusion was complicated by an infection which required an irrigation and debridement and post-operative antibiotics. MRI of the cervical spine revealed uncinated hypertrophy and degenerative discs C5-7, without significant stenosis. [Plaintiff] has been recommended to undergo an ACDF (anterior cervical discectomy and fusion) at C5-C7. The provider recommended permanent disability if surgery is not approved.

Dr. Johnston: pain management. Treated with epidural injections and medications [.]

Dr. Belleau noted the 1/5/17: NCS/EMG studies revealed carpal tunnel syndrome and no cervical radiculopathy[.]

From April 2013 to 2017 Dr. Broyles evaluated and treated for osteoarthritis of the hip. A recommendation for total hip arthroplasty was made prior to the MVC in question and subsequently performed on 5/16/14. [Plaintiff] noted improvement following surgery.

Dr. Ferachi performed an Independent Medical Examination (IME) on 10/31/16. [Plaintiff[ had complaints of back and neck pain. The exam documented a well healed lumbar incision, functional range of motion of the neck, back and hip, no tenderness to palpation, 5/5 strength in the upper and lower extremities, intact sensation, a negative Spurling's, Hoffman's, straight leg raise and downgoing Babinski. Imaging studies revealed degenerative changes and a lumbar fusion. [Plaintiff] was determined to have achieved MMI (maximum medical improvement) status.

(Doc. 10-7 at H1117-1118.)

Dr. Zarro then concluded:

[Plaintiff's] diagnoses are cervical and lumbar disc degeneration, osteoarthritis of the hip and carpal tunnel syndrome. These diagnoses are from 4/14/13 and forward. [Plaintiff] has [been] treated with a left total hip arthroplasty on 5/16/14 and a lumbar fusion on 5/19/15. [Plaintiff] underwent an IME on 10/31/16 where well healed incisions were noted, functional range of motion and intact strength. [Plaintff] was made MMI.

From 4/14/13 to 5/15/14 [Plaintiff] required restrictions secondary to hip and back symptoms. [Plaintiff] could walk, stand, sit, perform fine motor functions, reach

drive and use foot controls without restrictions. He could bend occasionally. He should avoid climbing ladders. He could lift, push, pull and carry up to 15 pounds frequently, 115-25 pounds occasionally, and not more than 25 pounds. He could work a full 8 hour day, 5 days a week with these restrictions in place.

From 5/16/14 to 8/16/14 he required a period of rest and recovery without work as he recovered from hip surgery.

From 8/17/14 to 5/18/15, [Plaintiff] required restrictions secondary to hip and back symptoms. [Plaintiff] could walk, stand, sit, perform fine motor functions, reach drive and use foot controls without restrictions. He could bend occasionally. He should avoid climbing ladders. He could lift, push, pull and carry up to 15 pounds frequently, 115-25 pounds occasionally, and not more than 25 pounds. He could work a full 8 hour day, 5 days a week with these restrictions in place.

From 5/19/16 to 11/19/16, [Plaintiff] required a period of rest and recovery from spine surgery without work.

From 11/20/16 and forward [Plaintiff] could walk, stand, sit, perform fine motor functions, reach drive and use foot controls without restrictions. He could bend occasionally. He should avoid climbing ladders. He could lift, push, pull and carry up to 15 pounds frequently, 15-25 pounds occasionally, and not more than 25 pounds. He could work a full 8 hour day, 5 days a week with these restrictions in place. A re-assessment should occur if additional surgery take[s] place; otherwise these are the permanent restrictions.

(Doc. 10-7 at H1118-1119.)

  e. *Employability Analysis*

   Based on Dr. Zarro's conclusions, Hartford also conducted an Employability Analysis by a Vocational Rehabilitation Clinical Case Manager ("Case Manager") to identify any occupation that Plaintiff would be able to perform given his medical condition, education, training and experience. (Doc. 10-7 at H1099.) The Case Manager found Plaintiff would be employable in occupations including, Escort Vehicle Driver, Airline Security Representative, Routing Clerk. (*Id.* at H1083-1085.)

  f. *Social Security determination*

In a letter dated September 4, 2017, the Social Security Administration provided a Notice of Award to Plaintiff informing him that he was entitled to monthly disability benefits beginning November 2014. (Doc. 10-4 at H0114-H0117.)

g. *Initial benefit letter*

In a letter dated October 31, 2017, Hartford informed Plaintiff of its decisions regarding his benefits, including that Plaintiff would no longer be eligible for benefits beyond November 19, 2016. (Doc. 10-3 at H065.) The letter set out the terms, conditions, and definitions in the Disability Policy, the information Hartford reviewed and considered, and provided a summary of the information Hartford developed. (*Id.*) The letter also addressed the differences between the benefits guidelines set forth by the Social Security Administration and the Disability Policy. (*Id.*) The letter informed Plaintiff that "Based on this information, we have concluded that you are not prevented from performing the essential duties of Any Occupation. Because of this, you do not meet the policy definition of Disability as of November 20, 2016 and your LTD benefits will terminate on that date." (Doc. 10-3 at H066.)

The letter also informed Plaintiff that

Under the Policy, legal action cannot be taken against us more than 3 years after the date Proof of Loss is required to be given according to the terms of the Policy. Please consult the Policy's Legal Actions and Sending Proof of Loss provisions for additional information.

(Doc. 10-3 at H0066.)

h. *Plaintiff's appeals*

Plaintiff appealed Hartford's decision on February 19, 2018 but did not provide any new evidence, documentation, or information with his appeal. (Doc. 10-7 at H1082.) Hartford reviewed Plaintiff's claim and affirmed its decision in a letter dated March 12, 2018 ("Appeal Letter"). (Doc. 10-3 at H0055-H0059.) The Appeal Letter sets out the medical history, the

information reviewed in the claims process and appeal process, addressing the evidence provided

by the treating physicians, and Dr. Zarro's conclusions. (*Id.*) Hartford again concluded that

Plaintiff was able to perform light or sedentary work and was not eligible under the Any

Occupation Standard. (*Id.*) The Appeal Letter also stated:

> You are entitled to receive, upon request and free of charge, reasonable access to,
> and copies of, all documents, records and other information relevant to this claim.
> You have the right under Section 502(a) of ERISA to bring a civil action disputing
> this adverse benefit decision. Although the Policy's Legal Actions provision
> contractually limits the time within which you may file such a civil action to no
> more than 3 years after the date Proof of Loss is required under terms of the Policy,
> we hereby extend the time for you to file a civil action disputing this adverse benefit
> decision to no later than March 12, 2021, which is 3 years from the date of this
> appeal decision.

(Doc. 10-3 at H0058.)

Plaintiff filed another appeal on April 30, 2018, which Hartford denied, stating that

Hartford's final appeal decision was made March 12, 2018 and Plaintiff had exhausted his

administrative remedies under ERISA and the Disability Policy. (Doc. 10-3 at H0054.) With the

help of counsel, Plaintiff filed another appeal on December 19, 2018, providing further evidence

and documentation to Hartford, which Hartford did not review. (Doc. 10-3 at H0052.) On

January 10, 2019 Plaintiff filed this lawsuit seeking a review of Hartford's decision. (Doc. 1.)

DISCUSSION

a. *Parties' arguments*

1. Hartford's *Motion for Judgment on the Administrative Record*

    A. *Defendant's arguments in support*

Defendant makes three main arguments: (1) Plaintiff's claims are barred by the statute of

limitations and the applicable three (3) year contractual limitations period in the Disability Policy

and as a matter of law; (2) Defendant did not abuse its discretion or act arbitrarily and

capriciously in denying Plaintiff's claim for continued benefits, as it conducted a thorough and

comprehensive review of Plaintiff's claim at the initial claim level and on appeal. (Doc. 15-3 at 2-3.)

Defendant argues, as to the statute of limitations, that the asserted date of disability was April 15, 2013, so proof of disability was due within ninety (90) days of the day on which benefits would be due. (*Id.* at 5.) If that is not possible, it must be submitted no later than one (1) year after proof of disability is otherwise due, unless the individual is incompetent.  Here, Defendant contends proof of disability was due on July 14, 2013 (90 days), or no later than April 15, 2014 (one year from the date of disability).  (*Id.*) But Plaintiff did not submit the claim until June 2017. (*Id.*) Though Defendant could have denied the claim as untimely, Defendant ultimately paid for the period from November 1, 2013 through October 31, 2015 and then for an additional period from November 1, 2015 through November 19, 2016. (*Id.* at 5-6.)

Further, Defendant asserts that under the terms of the Disability Policy, any legal action had to be started within 3 years of the date on which the proof of loss is required, which would be April 15, 2017. (*Id.* at 6.) But Plaintiff did not start the legal action until January 10, 2019. Looking therefore to ERISA for controlling law, Defendant argues that although ERISA does not contain a limitations period, the Fifth Circuit has held that, when a long-term disability policy sets forth a limitations period, then the contractually provided period applies. (Doc. 15-3 at 7.) The Fifth Circuit has also upheld a three year and 120-day limitations period.  (*Id.*) Turning to Louisiana law, Defendant maintains that the Louisiana Insurance Code authorizes statutes of limitation as short as 60 days and 1 year, which, according to the Fifth Circuit, can be incorporated into ERISA governed long-term disability plans. (*Id.* at 8.)

As to the second argument, Defendant urges that its decision is supported by "substantial evidence" and was not arbitrary or capricious; that is, the decision had a rational connection

between the known facts and the decision or between the found facts and the evidence. (*Id.* at 12.) Defendant considered an Independent Medical Peer Review and conducted an Employability Analysis. (*Id.*) Indeed, Plaintiff's own treating physician's records were included in the review.  (*Id.*) Like the Fifth Circuit case of *Holland v. International Paper*, 576 F.3d 240 (5th Cir. 2009), Defendant here reviewed all medical records and information submitted by Plaintiff and his treating doctors, gave Plaintiff opportunity to present medical evidence, utilized an independent physician to conduct a review, considered a comprehensive Employability Analysis Report, and rendered a decision.  (*Id.* at 12-13.) Dr. Zarro conducted a thorough review and concluded that Plaintiff was capable of performing light duty or sedentary level work activities for eight hours per day, five days per week, and Plaintiff's treating physician said something similar. (*Id.* at 16.)

Finally, Defendant argues that Plaintiff's receipt of social security benefits is irrelevant. The Fifth Circuit and Middle District have found as much. (Doc. 15-3 at 18.)

B. *Plaintiff's arguments in response to Defendant's Motion*

Plaintiff responds that, in Defendant's own denial letter, it extends the time for Plaintiff to bring an action until 2021. (Doc. 23 at 1-2.) Plaintiff next cites cases from the Ninth Circuit which condemn Defendant and its history of biased claims administration. (*Id.* at 4.) Plaintiff then argues that Defendant refused to consider Plaintiff's affidavit evidence of pain, restrictions, and medication side effects; Plaintiff's treating physician's opinion about restrictions, pain, and medication side effects; and third-party observations.  (*Id.* at 5-6.) Plaintiff asserts:

> But the law does require that a denial be "rational and in good faith", concrete and substantial, clearly supporting a denial. Hartford's refusal to consider critical evidence that the law says it must, on its face, is not rational or in good faith. Nor is an insurer's refusal to follow its own promised process for a full and fair review with an independent medical expert. That in and of itself is practically the definition of procedural unreasonableness, and is by no stretch of the imagination rational or in good faith. Nor is Hartford's failure to even provide the one medical paper review

> expert it did have, with piles of medical evidence, records and affidavit testimony he had not considered, to review and see if it had any bearing on his opinion. Nor is the decision to provide the insurer's vocational analysis asset with only the insurer's own medical expert's uninformed statement of restrictions. Nor is the sloppy manner in which Hartford erroneously performed its critical wage calculations it claims bounced Plaintiff from the definition of "own occupation" disability. Nor is Hartford's current pursuit of a bogus statute of limitations defense.

(Doc. 23 at 7–8.)  Plaintiff also denies that any Independent Medical Peer Review was conducted by a separate physician. (*Id.* at 8.) Plaintiff maintains that Defendant's actions are procedurally unreasonable, and they had a conflict of interest in its appeal decision. (*Id.*)

Further, Plaintiff contends that Defendant's decision is only entitled to deference to the extent it reflects "a reasonable and impartial judgment." (Doc. 23 at 9 (citation omitted).) Plaintiff cites a number of decisions in which appellate courts have found an insurer was arbitrary and capricious in deliberately ignoring evidence of significant pain. (*Id.* at 9-10.) Further, Dr. Zarro's opinion on the date of disability is arbitrary as well. (*Id.* at 12.) Plaintiff also cites authority that a company acts arbitrarily and capriciously in relying on its own expert rather than the treating physician. (*Id.*)

### C. *Defendant's arguments in reply*

In reply, Defendant responds that the three-year statute of limitations is controlling. (Doc. 25 at 1-2.)  Defendant also notes that, while the claim determination letter gave an "erroneous date beyond that which is applicable under the terms of the [Disability Policy]," the Disability Policy limitations period and way of calculating that period control. (*Id.* at 2, n. 2)

Defendant further argues that its alleged history of claims bias and a conflict of interest is incorrect and unsupported by the record. (*Id.* at 2.) Almost all of Plaintiff's cases come from the Ninth Circuit, and the single Fifth Circuit case stated that "the factors of a plan administrator's decision 'are case-specific and must be weighed together' before determining whether a plan administrator abused its discretion in denying benefits." (Doc. 25 at 2.)  That Fifth Circuit case

was also distinguishable, as the conflict of interest was more significant there. (*Id.* at 2-3.) Defendant then cites a host of cases from the Fifth Circuit and Louisiana that found no arbitrary and capricious denial. (*Id.* at 3.) Defendant next cites decisions from other circuits affirming Defendant's termination of benefits. (*Id.* at 4.)

Additionally, Defendants argue that the decision was not arbitrary and capricious.  (Doc. 25 at 4-5.) Defendant relied on a Physician Interview Form, and, while this was completed for worker's compensation purposes, the document still said Defendant could return for light duty. (*Id.* at 5.) Next, Defendant attacks Plaintiff's argument that Defendant should have considered information from her attorney after Defendant made its final decision. (*Id.*) The Fifth Circuit specifically rejected this argument in *Kelle v. JP Morgan Chase Long Term Disability Plan*, 221 F. App'x 316 (5th Cir. 2007), and the Eastern District also highlighted the problems with this approach. (*Id.* at 6-7.) The correct approach is that the claim administrator's universe is limited to the information he possessed at the time of the decision.  To hold otherwise "would essentially make the claim process a moving target." (Doc. 25 at 9.)  Defendant concludes that Plaintiff is asking to substitute his judgment for that of the claim administrator. (*Id.* at 9.) But Defendant's decision is entitled to deference. (*Id.* at 9-10.)

2. Plaintiff's *Motion for Judgment on the Administrative Record*

   A. *Plaintiff's arguments in support*

Plaintiff argues that Defendant's review was procedurally unreasonable and its denial of Plaintiff's claim was an abuse of discretion. (Doc. 18 at 22.) Plaintiff argues that an abuse of discretion can occur when a plan administrator acts with procedural unreasonableness given a conflict of interest in the financial outcome of the claim. (*Id.* at 23.) In this case, Plaintiff contends that Hartford arbitrarily ignored, and expressly refused, to consider evidence that favored Plaintiff including:

14

> Plaintiff's affidavit testimony regarding his pain and the effects of his prescription narcotic medication and the sworn corroborating testimony of his wife. It included all of the medical records and opinions of Plaintiff's treating Orthopedic Surgeon, Dr. Harrod beyond July 26, 2017, including his assigned physical restrictions and Plaintiff's inability to drive. It included pharmaceutical records and the effects of Plaintiff's narcotic medications.

(*Id.* at 25.) Plaintiff maintains that this evidence, provided to Hartford before the filing of this suit, should have been considered in the administrative record.

Plaintiff also asserts that Hartford "butchered procedural 'full and fair review'" when it "disregarded its own policy and ERISA regulations that require administrative appeal review to include appropriate medical specialty review and opinion, different than that of the original denial."  (*Id.* at 25-26.) "[Hartford] instead relied on the same Dr. Zarro opinion it retained to support its original denial." (*Id.* at 25.)

Plaintiff next argues that Hartford's denial was arbitrary and capricious because Hartford had a financial conflict of interest; it ignored Plaintiff's subjective reports of pain; it ignored Plaintiff's wife's account of his pain; and did not take into account the opinions of Plaintiff's treating physicians. (Doc. 18 at 29.) Last, Plaintiff argues that Defendant calculated the monthly benefit and the earning potential and vocational analysis incorrectly. (*Id.* at 29-31.)

Plaintiff concludes that Hartford acted for its own financial interest in refusing to consider relevant evidence, failing to follow its own procedures and the ERISA guidelines, and making arbitrary calculations to deny the claim. (*Id.* at 32.) Plaintiff urges the Court to consider the procedural unreasonableness to find abuse of discretion, even if Defendant can point to substantial evidence in support of its denial. (*Id.* at 33.) Plaintiff also asks for attorney's fees and costs. (*Id.*)

B. *Defendant's arguments in response*

Hartford submits that the administrative record demonstrates that it conducted a thorough review and evaluation of the medical records and information from Plaintiff's treating physicians. (Doc. 24 at 4-5.)  Hartford further maintains that under Fifth Circuit and United States Supreme Court precedent, there is no special deference to the statements and opinions of treating physicians.  (*Id.* at 5 (citing *The Black & Decker Disability Plan v. Nord*, 123 S.Ct. 1965, 1972 (2003)).) Hartford contends that it was reasonable for it to rely on Dr. Zarro's comprehensive review of Plaintiff's course of treatment and conclusions as a part of its claims process and therefore was not arbitrary and capricious. (Doc. 24 at 7.)

Hartford argues that under Fifth Circuit precedent it was not required to obtain an independent medical examination, because Hartford was not required to do more than review the information and medical records provided. (*Id.* at 8.) Hartford further details that the ERISA claims regulations do not require an independent medical examination of disability claimants. (*Id.*)

Hartford disputes that it had to consider the administrative record evidence provided to it after Hartford informed Plaintiff that he had exhausted his administrative evidence and rendered its final appeal decision, in the Appeal Letter on March 12, 2018. (*Id.*) Hartford argues it had no reason to consider evidence submitted in the two appeals made after Hartford informed Plaintiff that he had exhausted his administrative remedies and that no further information submitted would be reviewed. (*Id.* at 9.) Hartford maintains that its approach was consistent and follows the procedures in the Disability Policy and by ERISA, which only allow for one appeal. (*Id.* at 10.)

Next, Hartford responds that an award of Social Security Disability benefits is based on different guidelines than a determination of benefits under the Disability Policy. (*Id.*) Further, Hartford asserts that Supreme Court, Fifth Circuit and Middle District case law all have

expressly rejected the argument that an ERISA plan administrator must give deference to an award of Social Security Disability Benefits. (*Id.*) As Hartford explained in its claim determination letter, while Social Security Disability Benefits are a factor it considers, it is not a controlling factor. (*Id.* at 11.)

Hartford rejects Plaintiff's argument that because it has a financial conflict of interest as both the insurer and claims administrator, the Court should give its determination less deference. (Doc. 24 at 12.) In contrast, Hartford explains that under Fifth Circuit case law, where a conflict of interest exists, the Fifth Circuit has instructed to apply a sliding scale to its arbitrary and capricious review. (*Id.*) Hartford asserts that there is only a minimal basis of a conflict of interest and therefore "only a modicum less deference" should be given. (*Id.* (quoting *MediTrust Financial Services v. The Sterling Chemical*, 168 F.3d 211 (5th Cir. 1999).) In addition, a conflict of interest is only one factor in determining if an abuse of discretion has occurred. (*Id.*)

Next, Hartford argues that because Plaintiff does not claim in the Complaint that the benefits calculations, potential calculation, and vocational analysis were wrong, Plaintiff cannot now change his factual/legal theory at summary judgment. Hartford therefore asks the Court to disregard Plaintiff's arguments as to the correctness of the calculations. (*Id.* at 14.) If the Court does not disregard those arguments, Hartford asserts that its interpretation of the policy is a fair reading of the Disability Policy's language and Plaintiff's calculations must be rejected. (*Id.*) Hartford further argues that as it was not required under ERISA to do an Employability Analysis, any flaw in the process is immaterial to the benefit decision. (*Id.* at 16-17.)

Finally, Hartford objects to any award of attorney's fees and asks the Court to use its discretion to deny Plaintiff's claim for fees. Hartford argues that it has preceded in good faith and has not sought to harass Plaintiff. Hartford further argues that any award of attorney's fees

will do nothing to deter others. In conclusion, Hartford reserves the right to seek attorney's fees in the event it prevails.

####    C.   *Plaintiff's reply*

Plaintiff argues that the Administrative Record and Hartford's arguments are at odds because Dr. Zarro did not consider any of the record evidence Plaintiff provided in December 2018 before it filed suit. (Doc. 28 at 1.) Plaintiff likewise contends that the treating physician is substantially more reliable than the independent medical review conducted by Dr. Zarro. (*Id.* at 4.)

Plaintiff reasserts that Hartford was required on appeal to re-evaluate the medical evidence when conducting an appeal, and that the refusal to do so makes Hartford's actions procedurally unreasonable. (*Id.*) The fact that no new medical processional reviewed the evidence submitted, after the first administrative appeal, Plaintiff outlines is arbitrary and capricious and not in good faith to its claimant.

Plaintiff argues that Hartford had notice of the benefit miscalculations arguments in the Complaint, and in an email sent to counsel for Hartford on April 30, 2019. (Doc. 28 at 6.) The Complaint states:

> Plaintiff has been since prior to May 1, 2013, remains to date and is expected to remain indefinitely disabled and entitled to disability benefits under the terms of the Plan. Despite receiving overwhelming proof that Plaintiff remained qualified for benefits under the plan terms, Defendant, HARTFORD, prematurely, arbitrarily and capriciously misinterpreted the Plan's terms and provisions and made erroneous factual findings to discontinue and deny Plaintiff's benefits.

(*Id.* (citing Doc. 1 at ¶¶ 9-11.) Because the Complaint adequately gives notice that Plaintiff would be making arguments relating to Hartford's plan interpretation, Plaintiff maintains that he can raise arguments regarding the meaning of benefits calculations and any occupation. Plaintiff then reiterates its arguments as to the interpretation of those terms. (Doc. 28 at 7-11.)

Plaintiff contends that attorney's fees should be awarded to the Plaintiff because this case satisfies all of the factors the Court should consider under 29 U.S.C. § 1132(g). (Doc. 28 at 11 - 14.)

    b.  *Analysis*

    1.  <u>Statute of limitations</u>

Hartford argues that Plaintiff filed his claim outside of the statute of limitations set forth in the Disability Policy as allowed by ERISA and by Louisiana law. Plaintiff claims that Hartford waived its contractual limitations defense in its Appeal Letter.

ERISA provides no federal statute of limitations for lawsuits seeking benefits. *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992) ("ERISA does not provide a statute of limitations for a section 502(a)(1)(B) claim to enforce plan rights."). The Court will "therefore apply the state statute of limitations most analogous to the cause of action raised." *Id.*; *see Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 337 (5th Cir. 2005) ("Because ERISA provides no specific limitations period, we apply state law principles of limitation."). In this case, under Louisiana law, the most analogous statute is the liberative ten-year prescriptive period for a breach of contract action. La. Civ. C. art. 3499.

However, when a disability policy contains an applicable contractual term limiting the time to bring a legal claim, "that lesser limitations schedule governs." *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 337 (5th Cir. 2005) (citing *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Emp. Benefit Plan,* 160 F.3d 1301, 1303–04 (11th Cir.1998); *Doe v. Blue Cross & Blue Shield United of Wisconsin,* 112 F.3d 869, 874–75 (7th Cir.1997)). In upholding the application of contract terms for ERISA plans, the Supreme Court has explained

The principle that contractual limitations provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA plan. "The plan, in short, is at the center of ERISA." *US Airways, Inc. v. McCutchen,* 569 U.S. ——, ——, 133 S.Ct. 1537, 1548, 185 L.Ed.2d 654 (2013). "[E]mployers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). And once a plan is established, the administrator's duty is to see that the plan is "maintained pursuant to [that] written instrument." 29 U.S.C. § 1102(a)(1). This focus on the written terms of the plan is the linchpin of "a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." *Varity Corp. v. Howe,* 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013).

Under Louisiana Revised Statute 22:975, a contract for disability insurance must include a policy provision that at a minimum states, "No legal action shall be brought to recover on this policy prior to the expiration of sixty days after proof of loss has been filed in accordance with the requirements of this policy. No legal action shall be brought after the expiration of one year after the time proof of loss is required to be filed." La. R.S. 22:975(A)(11). As the Disability Policy's contractual terms are more accommodating, it provides the controlling prescriptive period in this case. *Sargent v. Louisiana Health Serv. & Indem. Co.*, 550 So. 2d 843, 846 (La. App. 2nd Cir. 1989) ("[T]he insurance policy has the effect of law as it is clear and unambiguous and is not in conflict with statute or public policy. It sets forth the prescriptive provisions that control the present case.").

The applicable contractual term in the Disability Policy sets out:

**Legal Actions:** *When can legal action be taken against Us?* Legal action cannot be taken against [Hartford]: 1) sooner than 60 days after the date Proof of Loss is given; or 2) more than 3 years after the date Proof of Loss is required to be given according to the terms of The Policy.

(Doc. 10-2 at H0020.) Under the Disability Policy, Proof of Loss

must be sent to [Hartford] within 90 days after the start of the period for which [Hartford] [is] liable for payment. If proof is not given by the time it is due, it will not affect the claim if: 1) it was not possible to give proof within the required time;

and 2) proof is given as soon as possible; but 3) not later than 1 year after it is due, unless [participant] [is] not legally competent. [Hartford] may request Proof of Loss throughout [the] Disability. In such cases, [Hartford] must receive the proof within 30 day(s) of the request.

Therefore, Hartford concludes:

In the present case, the latest that proof of disability was due was April 15, 2014. As such, the three (3) year contractual statute of limitations period in the [Disability] Policy for Plaintiff to initiate any legal action was by April 15, 2017. As the civil record in the above-captioned lawsuit reflects, Plaintiff did not initiate legal action and file his Petition until January 10, 2019.

(Doc. 15-3 at 6.)

Hartford is correct that the contractual statute of limitations period ended April 15, 2017.

However, Plaintiff argues that waiver applies in this case because the Appeal Letter stated:

Although the Policy's Legal Actions provision contractually limits the time within which you may file such a civil action to no more than 3 years after the date Proof of Loss is required under terms of the Policy, we hereby extend the time for you to file a civil action disputing this adverse benefit decision to no later than March 12, 2021, which is 3 years from the date of this appeal decision.

(Doc. 10-3 at H0058.) As the Fifth Circuit stated, "The doctrine of waiver is already an important component of insurance law", which is defined as "the voluntary or intentional relinquishment of a known right." *Pitts By & Through Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir. 1991). In this case, Hartford was aware of the Legal Actions provision, and by stating in the Appeal Letter to Plaintiff that "we hereby extend the time for your to file a civil action disputing this adverse benefit decision to no later than March 12, 2021," Hartford voluntarily and intentionally relinquished that right. Therefore, the Court finds Plaintiff's lawsuit is not time-barred under the contractual provision limiting the time to bring an action.

2. Extent of the administrative record

In *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir. 1999), the Fifth Circuit, sitting en banc explained:

21

In *Moore,* we said that "we may consider only the evidence that was available to the plan administrator in evaluating whether he abused his discretion in making the factual determination." *Moore,* 993 F.2d at 102. If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record. *See, e.g., Wildbur,* 974 F.2d at 634–35. Thus, we have not in the past, nor do we now, set a particularly high bar to a party's seeking to introduce evidence into the administrative record.

We hold today that the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.

*Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir. 1999) (*overruled on other grounds by North Cypress Med. Crt. Operating Co., v. Cigna Healthcare*, 952 F.3d 708 (5th Cir. 2020). There is an obvious tension in *Vega* between the Fifth Circuit's command to consider only the evidence available to the administrator and the command that the Court should also consider additional evidence that the administrator did not review. As a panel on the Fifth Circuit explained:

Subsequent panels of [the Fifth Circuit] and several district courts within the circuit have wrestled with this language from *Vega,* which could be read to allow claimants to add material to the administrative record long after exhausting their final administrative appeal, even without a showing that the evidence was unavailable to them while their administrative appeal was pending or that they made a good-faith effort to discover or submit the information during the administrative process.

*Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 516 (5th Cir. 2010).

As one district court noted:

The precise requirements of *Vega* remain uncertain. *Cf. Corry v. Liberty Life Assur. Co. of Boston,* 499 F.3d 389 (5th Cir.2007) (citing *Vega* and holding that affidavits submitted after a final administrative appeal but more than one year before the claimant filed her federal suit were properly considered part of the record), *with Keele v. JP Morgan Chase Long Term Disability Plan,* 221 F.App'x 316 (5th Cir.2007) (noting Vega's departure from precedent and raising without deciding some of the questions left unanswered by the decision).

*Richardson v. Metro. Life Ins. Co.*, No. 12-2802, 2014 WL 1050758, at *8 (E.D. La. Mar. 14, 2014). Sitting en banc in *Ariana M. v. Humana Health Plan of Texas, Inc.*, the Fifth Circuit upheld *Vega*'s treatment of the administrative record and explained, "Under *Vega*, a plan administrator must identify evidence in the administrative record, giving claimants a chance to contest whether that record is complete. Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts." 884 F.3d 246, 256 (5th Cir. 2018). The Court notes that the parties stipulated that the Administrative Record was composed of the documents filed in Docket No. 10, which includes the records Plaintiff submitted to Hartford after Hartford informed Plaintiff that he had exhausted his administrative options. (Doc. 12; *see* Doc. 10-4 at H00295-297.)

In resolving the tension in *Vega*, the Court will consider first the evidence before Hartford when it made its initial decision and its decision on appeal. Then, if necessary, the Court will consider whether Hartford abused its discretion when it refused to reconsider the denial of benefits when Plaintiff submitted additional evidence after Hartford informed him that he had exhausted his administrative remedies and no further appeal would be considered.

   3.  Challenge to procedural requirements under ERISA

Plaintiff argues that he was denied the opportunity for a full and fair review as required under ERISA. (Doc. 18 at 25-26.) The Fifth Circuit has explained that

> Section 1133 and its corresponding regulations require that the Plan: (1) provide adequate notice; (2) in writing; (3) setting forth the specific reasons for such denial; (4) written in a manner calculated to be understood by the participant; and (5) afford a reasonable opportunity for a full and fair review by the administrator. . . . The statute and regulations do not require compliance with Section 1133 *at each and every level* of review of a Plan's internal claims processing. The end goal of judicial intervention in ERISA is not to correct problems at every level of plan administration, but to encourage resolution of the dispute at the administrator's level before judicial review.

*Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 540 (5th Cir.

2007), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242

(2010); *see* 29 U.S.C. § 1133(2) ("In accordance with regulations of the Secretary, every

employee benefit plan shall-- . . .(2) afford a reasonable opportunity to any participant whose

claim for benefits has been denied for a full and fair review by the appropriate named fiduciary

of the decision denying the claim."). Therefore, "[c]hallenges to ERISA procedures are evaluated

under the substantial compliance standard. *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652

(5th Cir. 2009) (citing *Lacy v. Fulbright & Jaworski,* 405 F.3d 254, 257 (5th Cir.2005)).

Under the ERISA regulations interpreting § 1133, a plan providing disability benefits

must comply with 29 C.F.R. § 2560.503-1(h)(3)(i)-(v) to "be deemed to provide a claimant with

a reasonable opportunity for a full and fair review of a claim and adverse benefit decision." 29

C.F.R. § 2560.503-1(h)(4). Therefore, the claims procedures of a disability plan must

> [p]rovide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

29 C.F.R. § 2560.503-1(h)(3)(iii). In addition, claims procedures must

> (v) Provide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual

29 C.F.R. § 2560.503-1(h)(3)(v).

In other words,

> ERISA regulations provide insight into what constitutes full and fair review. Applicable regulations dictate that procedures "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination" unless several procedural requirements are met, four of which are relevant to this appeal: (1) review must "not afford deference to the

initial adverse benefit determination" and may not be "conducted" by the same person who made the initial determination; (2) when an "adverse benefit determination ... is based in whole or in part on a medical judgment," the appeal must include consultation "with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment"; (3) the claims procedure must "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination"; and (4) the healthcare professional consulted in an appeal may not be the same individual who was consulted in connection with the original determination.

*Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009).

Hartford's Disability Policy, in compliance with these regulations the Disability Policy states,

The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the individual who made the initial benefit decision, nor the subordinate of such individual. The review process provides for the identification of the medical or vocational experts whose advice was obtained in connection with an initial adverse decision, without regard to whether that advice was relied upon in making that decision. When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.

(Doc. 10-2 at H0037.)

However, when justifying its decision in this case, the Appeal Letter relies on the same conclusions reached by Dr. Zarro to support Hartford's determination to deny Plaintiff benefits during the administrative appeal. As such, it appears that Hartford failed to engage an individual who had not been previously consulted in connection with the adverse benefit determination, as required by the ERISA regulations and under the terms of the Disability Policy. *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009) ("While the same doctor can participate in (rather than conduct) both administrative appeals, *exclusive reliance* on the opinion of the same doctor in both appeals runs afoul of § 2560.503–1(h)(3)(ii).") Or if Hartford did

engage another individual, it failed to disclose the identity of the medical expert upon whose advice it relied.

Medical judgment, including what Plaintiff could and could not do given his physical limitations, is a central question in this benefit determination. Therefore, the Court concludes that Hartford failed to substantially comply with ERISA regulations and Plaintiff was not afforded a full and fair review of his adverse benefit determination during his administrative appeal. Having so concluded, the Court must determine the appropriate remedy.

When determining the appropriate remedy for a plan administrator's noncompliance with ERISA and its regulations, the Fifth Circuit has explained that:

> Remand to the plan administrator for full and fair review is usually the appropriate remedy when the administrator fails to substantially comply with the procedural requirements of ERISA. This position is consistent with the default rule of other circuits and our pronouncement in *Wade* that procedural violations of ERISA generally do not give rise to a substantive damages remedy. When the procedural violations are non-flagrant, remand is typically preferred over a substantive remedy to which the claimant might not otherwise be entitled under the terms of the plan.

*Lafleur*, 563 F.3d at 157–58. However,

> [an] exception to the remand rule applies where the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law. . . . "A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground. If the administrative record reflects, at minimum, a colorable claim for upholding the denial of benefits, remand is usually the appropriate remedy. The court must make this determination on a case-by-case basis.

*Id.* at 158 (internal quotations and citations omitted).

In this case, the Administrative Record reflects a colorable claim for upholding the denial of benefits. Therefore, the Court concludes that remanding this case to Hartford to conduct a full

and fair review of the denial of Plaintiff's benefits, taking into account all information contained in the Administrative Record (Doc. 10), is the appropriate remedy.

CONCLUSION

Accordingly,

IT IS ORDERED that the *Motion for Judgment on the Administrative Record filed* by Defendant Hartford Life and Accident Insurance Company (Doc. 15) is DENIED;

IT IS FURTHER ORDERED that the *Plaintiff's Trial Brief in Support of Judgment on Administrative Record* filed by Plaintiff, Gary Joseph, (Doc. 18) is DENIED;

IT IS FURTHER ORDERED that this matter is remanded to Hartford Life and Accident Insurance Company for further proceedings consistent with this opinion.

Signed in Baton Rouge, Louisiana, on July 13, 2020.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**